NOT FOR PUBLICATION

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re:<br><br>G-I HOLDINGS, INC., et. al (f/k/a GAF CORPORATION),<br><br>                    Debtor. | Bankr. Case Nos.<br>  01-30135 (RG)<br>  01-38790 (RG)<br>(Jointly Administered) |
| OFFICIAL COMMITTEE OF ASBESTOS CLAIMANTS,<br><br>                    Appellant,<br><br>v.<br><br>THE BANK OF NEW YORK, G-I HOLDINGS, INC. and BUILDING MATERIALS CORPORATION OF AMERICA,<br><br>                    Appellees/Cross Appellants. | Civil No. 04-3423<br>     (WGB)<br><br>**O P I N I O N** |

**APPEARANCES:**

**RIKER, DANZIG, SCHERER, HYLAND & PERRETTI LLP**
By:  Dennis J. O'Grady, Esq.
     J. Alex Kress, Esq.
Headquarters Plaza
One Speedwell Avenue
Morristown, New Jersey 07962

**WEIL GOTSHAL & MANGES, LLP**
By:  Matin J. Bienenstock, Esq.
     Kathryn L. Turner, Esq.
767 Fifth Avenue
New York, New York 10153

**OKIN, HOLLANDER & DELUCA LLP**
By:  James J. Deluca, Esq.
One Parker Plaza
Suite 1201
Fort Lee, New Jersey 07204

**DUANE, MORRIS & HECKSHER, LLP**

By:  William S. Katchen, Esq.
744 Broad Street
Newark, New Jersey 07102

       Counsel for Appellee/Cross Appellants

**LOWENSTEIN SANDLER, PC**
By:  Jeffrey D. Prol, Esq.
     Jeffrey A. Kramer, Esq.
     Scott Cargill, Esq.
65 Livingston Avenue
Roseland, New Jersey 07068

**CAPLIN & DRYSDALE, CHARTERED**
By:  Elihu Inselbuch, Esq.
399 Park Avenue, 27th Floor
New York, New York 10022

**CAPLIN & DRYSDALE, CHARTERED**
By:  Trevor W. Swett, Esq.
     Peter Van N. Lockwood, Esq.
One Thomas Circle, N.W.
Washington, D.C. 20005

       Counsel for Appellant

**BASSLER, SENIOR DISTRICT JUDGE:**

       This opinion addresses the appeal[1] of the Official Committee

of Asbestos Claimants ("Committee") and the Cross-Appeal of G-I

Holdings ("G-I Holdings") (debtor in possession) and its

(indirect) subsidiary Building Materials Corporation of America

("BMCA") and The Bank of New York ("BNY")[2] from various decisions

_____

[1] 28 U.S.C. § 158(a)(3) gives this Court jurisdiction to hear appeals
from interlocutory orders and decrees of bankruptcy judges where leave has
been granted, which was granted to the Committee by Order dated March 29,
2005, and to G-I Holdings, BMCA and BNY for cross-appeals by Consent Order
dated May 20, 2005 Order.

[2] BNY appeared in opposition to the Committee's motion in two
capacities:  (1) for itself and as agent for a group of institutions as
lenders to BMCA under revolving credit agreements and (2) as Indenture

2

of the Bankruptcy Court including its decision permitting the
Committee to file an adversary proceeding challenging as
fraudulent the transfer of assets from G-I Holdings to its
subsidiary BMCA in 1994 but denying the Committee leave to sue to
avoid liens given by BMCA to its note holders in 2000.

## I.  SOME FACTUAL AND PROCEDURAL BACKGROUND

To narrate the entire procedural history of this case to
date would be a torturous and redundant exercise but some
background is necessary to understand the issues on appeal.[3]  On
July 7, 2004, the United States Bankruptcy Court for the District
of New Jersey (Gambardella, C.B.J.) entered an order (the
"Authorization Order") denying in part the motion of the
Committee, the appellant, to modify a previously issued
preliminary injunction (the "Preliminary Injunction").  The
modification would have permitted the Committee to bring on

---

Trustee under various notes issued by BMCA.

[3] See In re G-I Holdings, Inc., 385 F.3d 313 (3d Cir. 2004); In re G-I
Holdings, Inc., 380 F. Supp. 2d 469 (D.N.J. 2005); In re G-I Holdings,
Inc., 328 B.R. 691 (D.N.J. 2005); In re G-I Holdings, Inc., 318 B.R. 66
(D.N.J.), aff'd, 122 Fed. Appx. 554 (3d Cir. 2004); In re G-I Holdings,
Inc., 218 F.R.D. 428 (D.N.J. 2003); In re G-I Holdings, Inc., 295 B.R. 502
(D.N.J. 2003); In re G-I Holdings, Inc., 295 B.R. 222 (D.N.J. 2003); In re
G-I Holdings, Inc., 295 B.R. 211 (D.N.J. 2003); In re G-I Holdings, Inc.,
338 B.R. 232 (Bankr. D.N.J. 2006); In re G-I Holdings, Inc., 327 B.R. 730
(Bankr. D.N.J. 2005); In re G-I Holdings, Inc., 323 B.R. 583 (Bankr. D.N.J.
2005); In re G-I Holdings, Inc., 313 B.R. 612 (Bankr. D.N.J. 2004); In re
G-I Holdings, Inc., 308 B.R. 196 (Bankr. D.N.J. 2004); In re G-I Holdings,
Inc., 292 B.R. 804 (Bankr. D.N.J. 2003); In re G-I Holdings, Inc., 278 B.R.
376 (Bankr. D.N.J. 2002); In re G-I Holdings, Inc., 278 B.R. 725 (Bankr.
D.N.J. 2002).

behalf of the estate of G-I Holdings certain avoidance actions. The Authorization Order reflected the decision of the Bankruptcy Court issued on June 8, 2004 (the "Opinion").  See In re G-I Holdings, Inc., 313 B.R. 612 (Bankr. D.N.J. 2004).  A more complete background, relevant to the issues on this appeal, can be found in the Opinion.

GAF Corporation ("GAF"), with approximately 500,000 asbestos actions pending against it, merged into G-I Holdings.  In 1994, pursuant to a Reorganization Agreement,[4] GAF Building Materials Corporation ("GAF BMC"), an indirect subsidiary of GAF, formed a wholly-owned subsidiary, which came to be known as BMCA.  In return for BMCA's stock, GAF BMC transferred substantially all of its roofing and building materials business to BMCA, with BMCA assuming liability for the first $204 million of GAF BMC's asbestos liabilities.  The Reorganization Agreement also provided that GAF and GAF BMC indemnify BMCA from any asbestos liability over and above the assumed $204 million obligation.  313 B.R. at 625.  This transfer of assets to BMCA and assumption of (some) liabilities is commonly referred to by the parties and the Bankruptcy Court as the Pushdown Transaction.  BMCA is not a

_____

[4] According to BNY, pursuant to the Reorganization Agreement of January 31, 1993, GAF BMC transferred substantially all of its operating assets to a company called GAF Newco in exchange for the issuance of all shares of GAF Newco's common stock and GAF Newco's assumption of related liabilities.  GAF Newco became BMCA.  (See Answering and Opening Brief of Appellees/Cross-Appellants at 10.)

debtor in any bankruptcy proceedings.

In December of 2000, BMCA encumbered all the assets of its roofing business through a first lien in favor of five banks, commonly referred to by the Bankruptcy Court and the parties as BNY Banks or BNY and a second lien on those same assets in favor of the Noteholders.  In 1999, BNY had provided BMCA with an unsecured revolving credit facility of $110 million with a maturity date of August 2002.  In exchange for granting a first lien on the assets of the roofing business in favor of BNY, BNY extended the maturity date of the existing revolving credit facility to August 2003 and made available to BMCA a new revolving credit line of up to $100 million.  (R. 7 at p. 14.)[5] The second lien was purportedly in exchange for the consent of the Noteholders (who held $540 million in outstanding notes) to BMCA's granting the first lien to BNY.

When the new revolving credit line of $100 million is added to the previous revolving credit facility of $110 million, along with certain other pre-existing obligations of approximately $10 million, the total secured claims of BNY came to $220 million.

---

[5] All references to the record on appeal are denoted "R." and the corresponding document number and page in the Record on Appeal submitted pursuant to the Court's May 20, 2005 Consent Order.  Where the specified item in the Record on Appeal contains exhibits or attachments, each exhibit is marked with a separate sub tab denoted "E" or "A".  Thus, "R. 7 at p. 14" refers to page 14 to item 7 in the Joint Record on Appeal, and "R. 8, A 1 at p. 7" refers to page 7 of Exhibit 1 to item 8 in the Joint Record on Appeal.

313 B.R. at 626.  The first lien to BNY and the second lien to the Noteholders is referred to by the Bankruptcy Court and the parties as the Securitization Transaction.

The Pushdown Transaction in 1994 and the Securitization Transaction in 2000 are worthy of a play by Pirandello. According to G-I Holdings and BMCA, the magnitude of the asbestos liability restricted access to capital markets, inhibiting growth of the business.  Since its creation in 1994, BMCA has been able to pay to G-I Holdings over $265 million in dividends, which has been used to pay asbestos claims.  (Answering and Opening Brief of Appellees/Cross Appellants at 9.)  Moreover, as a result of the separation of the roofing business BMCA has been able to access capital markets and is now the country's leading manufacturer of premium residential roofing products, including the Timberline and Sovereign series roofing shingles.  (Id.) Using its credit facilities and bond indentures, BMCA has made over seven acquisitions and now holds the number one market share position.  (Id.); see also 313 B.R. at 626.

On the other hand, the Committee contends that the Pushdown Transaction was intended to deny to the tort claimants access to the assets and business transferred to BMCA.  As to the Securitization Transaction, the Committee argues that the first lien not only secured BMCA's obligations under the new facility but, in effect, took the $100 million outstanding under the old

facility and other pre-existing obligations of $10 million and bootstrapped them along with the $110 million into a secured position to the detriment of the general creditors and asbestos claimants of G-I Holdings.  <u>Id.</u> at 625, 626.

On January 5, 2001, G-I Holdings, now only a holding company, filed a voluntary petition under Chapter 11 of the Bankruptcy Code and has been operating as a debtor-in-possession. <u>Id.</u> at 621.  On the same date, the Trustee appointed the Committee to represent individuals who claim to have suffered injuries related to the inhalation of asbestos from products manufactured by the predecessors of G-I Holdings.  The Bankruptcy Court also appointed a Legal Representative to represent persons with present and future asbestos-related claims against G-I Holdings.  <u>Id.</u> at 621-622.

In February of 2001, G-I Holdings and BMCA commenced an adversary proceeding seeking a judgment declaring that BMCA is not liable as a successor or alter ego for G-I Holdings' asbestos liabilities ("the Successor Liability Action").  The Committee intervened as a defendant and counterclaimed for a judgment declaring that BMCA was liable for G-I Holdings' asbestos liabilities under theories of successor liability and "piercing the corporate veil."  To protect its interests as a secured creditor of BMCA, BNY intervened as a defendant in the Committee's counterclaim.  This Court withdrew the reference to

7

the Bankruptcy Court.  Id. at 623.  The Successor Liability
Action is currently in the process of being pre-tried before
Magistrate Judge Madeline Cox Arleo and should be ready for trial
in the Fall of this year.

By order of April 6, 2001, the Bankruptcy Court denied the
Committee's motion for interim substantive consolidation.

After a June 8, 2001 hearing the Bankruptcy Court in
response to G-I Holdings application in January 2001 orally
granted a Preliminary Injunction.  The form of the order was not
finalized until February 22, 2002.  The Bankruptcy Court enjoined
any asbestos claimants from prosecuting pending actions and
future actions against G-I Holdings and BMCA.  The Preliminary
Injunction permitted BMCA to continue to operate its business in
the ordinary course as a non-debtor, but required BMCA to make
certain disclosures to the Committee with respect to its
operations and financing.  The order also prohibited BMCA from
refinancing or replacing BMCA's credit facility with BNY or
prepaying any outstanding public notes without first providing
thirty days' notice to the Committee.  Id. at 623.  The
Preliminary Injunction also tolled fraudulent conveyance causes
of action against BMCA "that had not expired as of January 5,
2001."  Id. at 646.

In March 2003, BMCA notified the Committee that it intended
to refinance its existing credit facilities.  In re G-I Holdings,

<u>Inc.</u>, 318 B.R. 66, 70 (D.N.J. 2004).  While the Committee and
Legal Representative did not oppose the refinancing, they sought
to modify the Preliminary Injunction by imposing a condition that
the refinancing would not insulate BNY from their claims or those
of G-I Holdings or BMCA to avoid the liens granted to BNY and to
recover payments made to BNY.  Agreeing with BNY, the Bankruptcy
Court determined that it lacked jurisdiction because the dispute
was not ripe for adjudication.  <u>Id.</u> at 72.  This Court's decision
affirming the Bankruptcy Court's decision, <u>In re G-I Holdings,</u>
<u>Inc.</u>, 318 B.R. 66 (D.N.J. 2004), was in turn affirmed by the
Third Circuit.  <u>In re G-I Holdings, Inc.</u>, 122 Fed. Appx. 554 (3d
Cir. 2004).

## II. THE BANKRUPTCY AUTHORIZATION OPINION

Relying on <u>In re Cybergenics</u>, 330 F.3d 548 (3d Cir. 2003),
the Committee then applied to the Bankruptcy Court to modify the
Preliminary Injunction for leave to act as the estate
representative under principles of derivative standing in order
to avoid as a fraudulent transfer under section 544(b) of the
Bankruptcy Code and applicable state law, the January 1994
Pushdown Transaction and to the extent of such avoidance to seek
to recover from BNY as subsequent transferees under section
550(a) of the Code the property interests transferred in the
December 2000 liens that were also the subject of the 1994
Pushdown Transaction.  <u>In re G-I Holdings, Inc.</u>, 313 B.R. 612

(Bankr. D.N.J. 2004).

In a comprehensive opinion of thirty-four pages, the Bankruptcy Court authorized the Committee to bring a fraudulent transfer action challenging the 1994 Pushdown Transaction as an actual or constructive fraud pursuant to § 544(b).[6]  Noting that the same executives control both G-I Holdings and BMCA, the Bankruptcy Court concluded that G-I Holdings' failure to institute an adversary proceeding challenging the Pushdown Transaction as a fraudulent transfer was unjustified.[7]  Id. at 643.  The Bankruptcy Court also permitted the Committee, in the avoidance action challenging the Pushdown Transaction, to include a recovery against BNY and the Noteholders as mediate or immediate transferees pursuant to § 550(a)(2) premised on the Committee's allegations that the assets subjection to the

---

[6] Section 544(b) requires that an estate representative must show the existence of an actual creditor holding an allowable unsecured claim who could avoid the challenged transfer under applicable state or federal law. The Bankruptcy Court held (1) the Committee could assert a fraudulent transfer claim premised on actual fraud pursuant to N.J.S.A. 25:2-25(a) if it could identify at least one claimant who did not become aware of any asbestos-related injury until one year (or less) prior to the Petition date January 5, 2001, and (2) the Committee could assert claims based on actual or constructive fraud pursuant to N.J.S.A. 25:2-25(a), N.J.S.A. 25:2-25(b) and N.J.S.A. 25:2-27(a) by utilizing the standing of the New Jersey Department of Environmental Protection which under state law can avail itself of a ten-year statute of limitations.  313 B.R. at 646-47, 649.

[7] The New Jersey UFTA is found in N.J.S.A. 25:2-25.  N.J.S.A. 25:2-25(a) addresses "actual fraud" while N.J.S.A. 25:2-25(b) deals with "constructive fraud."  Under N.J.S.A. 25:2-27(a), a transfer is also fraudulent where there has not been a reasonably equivalent exchange of value.

Securitization Transaction were the same or sufficiently related to the Pushdown Transaction.

As to challenging the Securitization Transaction, the Bankruptcy Court concluded that there was not a colorable claim: without a successful resolution of either the substantive consolidation action (pending in the Bankruptcy Court) or of the successor liability action (pending in this Court), the claim was not ripe for adjudication. Id. at 653. The Bankruptcy Court also dismissed the Committee's request to challenge the Securitization Transaction under the state law theory of piercing the corporate veil law since that claim already formed the basis for the substantive consolidation action and successor liability action.

Because the Pushdown Transaction occurred in early 1994, the immediate and significant hurdle for the Committee was whether the avoidance action was time-barred.[8] Section 544(b) gives the trustee or debtor-in-possession "no greater rights of avoidance than the creditor would have if it were asserting invalidity on its own behalf." 5 COLLIER ON BANKRUPTCY ¶ 544.09[3] (15th ed. rev.

_____

[8] Section 546(a)(1) of the Bankruptcy Code provides that an avoidance action must be commenced within two years from the entry of the order for relief and the state law statute of limitations must not have run before the debtor's filing for bankruptcy. 313 B.R. at 646. A fraudulent conveyance claim based on actual intent under New Jersey law would be time-barred by N.J.S.A. 25:2-31(a) (four years), which requires the action here to have been filed in February of 1998, almost three years before G-I Holdings filed for bankruptcy. Id.

11

2003).

In authorizing the Committee to bring the Pushdown Claims, the Bankruptcy Court concluded that the Committee could rely on the one-year discovery rule in the Uniform Fraudulent Transfer Act (UFTA) to avoid the Pushdown Transaction as an actual fraud pursuant to § 544(b) on behalf of asbestos tort victims.  Provided that the Committee could identify in its complaint at least one asbestos victim that did not become aware of an asbestos-related injury until one year prior to the date G-I Holdings filed for bankruptcy.  313 B.R. at 648-649.[9]

The Bankruptcy Court also concluded that the avoidance action for actual and constructive fraud was timely for another reason: the New Jersey Environmental Protection Agency was conceivably[10] an unsecured environmental creditor whose avoidance claims could be enforced for the estate as a whole.  And as to those claims, a ten-year statute of limitations was available.[11]  Id. at 635-638, 648-649.

What the Bankruptcy Court didn't buy into (and the subject of the Committee's Appeal) was the Committee's additional argument

---

[9] The Bankruptcy Court applied N.J.S.A. 25:2-25 as it was worded in 2002 rather than as it was worded at the time of the Pushdown Transaction in 1994. See infra note 13.  Neither party has argued that it makes a difference, probably because under the circumstances of this case it doesn't.

[10] The NJEPA had yet filed a claim but neither had a bar date been set.

[11] See N.J.S.A. 2A:14-1.2(a).

12

that the applicable statute of limitations with respect to the Pushdown Claims was equitably tolled by what it calls the Georgine Injunction.  Id. at 643; see Georgine v. Amchem Products, Inc., 878 F. Supp. 716, 726-27 (E.D. Pa. 1994), vacated by 83 F.3d 610 (3d Cir. 1996), aff'd sub nom. Amchem Products, Inc. v. Windsor, 521 U.S. 591 (1997).  In that case the United States District Court for the Eastern District of Pennsylvania prohibited "all members of the class certified by the Court by order dated August 16, 1994" from initiating or prosecuting asbestos-related claims against the Center for Claims Resolution ("CCR") defendants to which GAF was a party.  313 B.R. at 648.

The first reason the Bankruptcy Court gave for denying the Committee the benefit of the Georgine Injunction was that the Injunction applied to certified class members not asbestos victims in general and the Committee did not identify a single potential claimant who was a member of the certified class.  Id.  Secondly, the Bankruptcy Court noted that since BMCA was never a CCR defendant and not a party to the preliminary injunction of the Eastern District of Pennsylvania, the tolling effects of the Georgine Injunction never applied to BMCA.

### III. DISCUSSION OF THE COMMITTEE'S APPEAL[12]

---

[12] The standard of review applicable to findings of fact is clear error but conclusions of law are reviewed de novo.  Bank. R. 8013; see e.g., Mellon Bank, N.A. v. Metro Communications, Inc., 945 F.2d 635, 641-42 (3d Cir. 1991), cert. denied, 503 U.S. 937 (1992).  Legal conclusions based upon statutory construction are questions of law.  With respect to mixed

13

A.    Whether the Bankruptcy Court Erred In Holding That the
      Statute of Limitations Was Not Equitably Tolled

In the absence of equitable tolling, creditors would have had to bring a fraudulent transfer action to avoid the transfer of assets to BMCA within four years of the 1994 Pushdown Transaction or within one year after the transfer "was or could reasonably have been discovered" by a creditor.  See N.J.S.A. 25:2-31.[13] Although the Bankruptcy Court accepted two of the Committee's arguments why the action to set aside the Pushdown Transaction was not time barred, it rejected the third: that N.J.S.A. 25:2-31 was equitably tolled by virtue of the Georgine Injunction thereby suspending the statute of limitations with respect to asbestos claimants together with BMCA's voluntary tolling agreement.

To sort out the merits of this argument gets us into quite a

_____

questions of fact and law, this Court reviews "under a mixed standard, affording a clearly erroneous standard to integral facts, but exercising plenary review of the lower court's interpretation and application of those facts to legal precepts."  Schlumberger Res. Mgmt. Servs. v. CellNet Data Sys., 327 F.3d 242, 244 (3d Cir. 2003).  "When a bankruptcy judge's legal conclusions are challenged, the district court makes an independent determination of the applicable law."  Thomas v. Universal Am. Mortg., No. 97-5048, 1998 U.S. Dist. LEXIS 1392, at *8 (E.D. Pa. 1998) (citing In re Dunes Casino Hotel, 63 B.R. 939, 944 (D.N.J. 1986)).

[13] The Bankruptcy Court applied the statute of limitations in effect at the time of the decision, N.J.S.A. 25:2-31(a), effective November 18, 2002, rather than the statute in effect at the time of the transfer, L.1988, c.74 § 1, eff. Jan. 1, 1989.  Before amendment, the statute provided the following limitations period: within four years after the transfer or, if later, within one year after the transfer was "or could reasonably have been discovered by the claimant."  In 2002, the New Jersey Legislature amended N.J.S.A. 25:2-31(a) by deleting "or could reasonably have been" preceding "discovered".  2002 N.J. Laws 100, 2002 N.J. Sess. Law Serv. 100 (West).

14

maze.  For starters, the Georgine Injunction, as the Bankruptcy
court noted, pre-dated BMCA.  At the time BMCA was created in 1994
the predecessor of G-I Holdings, GAF Buildings Corporation, was a
member of the CCR, see Georgine v. Amchem Products, Inc., 83 F.3d
610, 617 n.1 (3d Cir. 1996), a not-for-profit corporation created
by certain asbestos defendants to defend and process asbestos-
related claims.  See Georgine v. Amchem Products, Inc., 157 F.R.D.
246, 257 n.3 (E.D. Pa. 1994).  On January 15, 1993, to implement a
proposed global settlement between asbestos claimants and members
of CCR, the settling parties filed a class action and a proposed
stipulation of settlement.  See Georgine v. Amchem Products Inc.,
878 F. Supp. 716, 720 (E.D. Pa. 1994).

     On September 21, 1994, the Eastern District of
Pennsylvania, in aid of the settlement, issued the injunction
which barred class members from "initiating or maintaining any
asbestos-related personal injury or death claim(s) or lawsuit(s)
against any CCR defendant in any court, either by way of
commencing litigation, intervening in existing litigation, joining
a CCR defendant in any existing litigation, or in any other manner
asserting such a claim, or further prosecuting any claim filed
January 24, 1994, except to arrange for deferral of an action
filed on or before the date of this Order until the issuance of
final judgment on the merits of this case."  Id. at 726-27
(emphasis added).

In June of 1996, the Third Circuit reversed and set aside the settlement, see 83 F.3d at 610, and on August 27, 1997, the District Court vacated the Georgine Injunction.  (R. 12, E 28.) The Committee therefore argues that since from September 21, 1994 until August 27, 1997 the Georgine Injunction prevented asbestos claimants from suing BMCA, the statute of limitations was interrupted for just under three years.  As a result, UFTA's four-year limitations period had not run by January 5, 2001, the date BMCA expressly tolled all statutes of limitations and repose for fraudulent conveyance claims pursuant to the Preliminary Injunction of the Bankruptcy Court.  (R. 12, E 1 at p 4.)

The Committee argues that in determining the colorable claim[14] element of the derivative standing test, see 313 B.R. at 630, the Bankruptcy Court erred in deciding that the Georgine Injunction was not equitably tolled as to BMCA by premature fact finding instead of accepting as true the allegations and facts pleaded in the complaint. In determining whether a claim is colorable, the standard is similar to that in reviewing a motion to dismiss.  Id. at 631.  Since factual disputes concerning the

---

[14] Utilizing standards from other Circuits (in the absence of any from this Circuit) to determine the Committee's derivative standing to bring an avoidance action on behalf of the debtor, the Committee was required to demonstrate that "1) a demand has been made upon the statutorily authorized party to take action; 2) the demand is declined; 3) a colorable claim that would benefit the estate if successful exists based on a cost-benefit analysis performed by the court; and 4) the inaction is an abuse of discretion (i.e., unjustified) in light of the debtor-in-possession's duties in a Chapter 11 case."  313 B.R. at 628-29.

applicability of a tolling doctrine should not be resolved at the motion to dismiss stage, see Oshiver v. Levin, Fishbein, Sedran & Berman, 38 F.3d. 1380 (3d Cir. 1994), the Committee argues that the Bankruptcy Court should not have decided the scope of the Georgine Injunction without a full evidentiary record.

The Committee also argues that the Bankruptcy Court erred by finding that the tolling doctrine was inapplicable because the Committee failed to identify an asbestos victim who was enjoined from filing suit because of the Georgine Injunction.  At this stage of the proceeding it is enough, the Committee argues, if it is apparent that such a creditor must exist as some courts have recognized: In re Image Worldwide, Inc., 139 F.3d 574, 577 (7th Cir. 1998); In re Leonard, 125 F.3d 543 (7th Cir. 1997); In re Intern Loan Network, Inc., 160 B.R. 1 (Bankr. D. Cal. 1993).

Finally the Committee argues that the Bankruptcy Court erred by holding that the Georgine Injunction did not bar asbestos claimants from suing BMCA when in fact it did.

The Committee first notes that if asbestos claimants had sued BMCA for fraudulent transfer they would have violated the injunction of the Eastern District of Pennsylvania because a suit to get back the transferred assets from the non-debtor transferee would necessarily entail an action against the debtor within the meaning of the Bankruptcy Code, as the Court held in In re Colonial Realty Co., 980 F.2d 125 (2d Cir. 1992).  The Committee

17

also points out (while not appropriate, as the Committee notes under the Rule 12(b)6) standard) that the proposed stipulation of settlement filed on January 15, 1993 with the complaint in the Georgine case defines "CCR Defendants" to include GAF Corporation, one of BMCA's predecessors, and identifies Additional Releasee(s) as follows:

> (1) each CCR Defendant(s)' present and former foreign and domestic parents, subsidiaries, and affiliates; (2) the foreign and domestic parents, subsidiaries, and affiliates; (2) the foreign and domestic predecessors, successors, distributors, vendees, transferees, insurers, and assigns of each CCR Defendant or of (1) above.

(Memorandum of Law in Support of Committee's Appeal at 41 (citing Proposed Stipulation of Settlement at 5).)

These terms, the Committee argues, entitle not only GAF but also BMCA as an additional releasee, to benefit from the Georgine Injunction.

If equitable tolling is applied to N.J.S.A. 25:2-31, the Bankruptcy Court erred by not assuming the truth of all facts asserted by the Committee with respect to equitable tolling and should not have made factual determinations concerning the scope of the Georgine Injunction without affording the Committee the opportunity to develop a factual record. Although recognizing that evaluating a colorable claim is much the same as evaluating a motion to dismiss, see 313 B.R. at 630, the Bankruptcy Court did not accept the Committee's allegations of fact as true and draw all reasonable inferences in favor of the Committee as is required

in considering a motion to dismiss.  See Oshiver v. Levin,
Fishbein, Sedran & Berman, 38 F.3d 1380, 1391 (3d Cir. 1994)
(reversing district court's decision that allegations in a
complaint were insufficient to invoke the doctrine of equitable
tolling and holding "all that was required of [plaintiff] at this
stage was that [plaintiff] plead the applicability of the
doctrine.").

        Moreover, if the doctrine of equitable tolling applied, the
Committee should also have been permitted to amend its claims to
identify a plaintiff whose claims against GAF and BMCA were
restrained by the Georgine Injunction in order to set aside the
Pushdown Claims on a theory of constructive fraud.  A proponent
of a claim under section 544(b) must, of course, prove the
existence of an allowable unsecured claimant as of the petition
date who could have avoided the transfer under state law.  Schaps
v. Ballys Place, Inc., 58 B.R. 581 (E.D. Pa. 1986), aff'd, 815
F.2d 693 (3d Cir. 1987).  But the Committee's argument makes
sense that at this stage it would be quite likely that with more
than 150,000 asbestos personal injury and wrongful death claims
pending as of January 5, 2001 (as G-I Holdings acknowledges), at
least one of these claimants was part of the class restrained by
the Georgine Injunction.[15]

_____

    [15] This analysis is similar to that adopted by the Bankruptcy Court
when it allowed the Committee to file an adversary complaint challenging
the Pushdown Claim premised on actual fraud pursuant to § 544(b) of the

                                   19

Despite these misssteps by the Bankruptcy Court, this Court will not reverse and remand for an evidentiary hearing as to the intent, scope, implications and content of the <u>Georgine</u> Injunction: because as G-I Holdings correctly argues, equitable tolling as matter of law is not applicable to a statute of repose and N.J.S.A. 25:2-31[16] is a statute of repose[17] as distinguished from a statute of limitations, which is subject to equitable tolling.

A statute of limitations is a procedural device that limits the remedy under an available cause of action.  <u>In re Williams</u>,

---

Bankruptcy Code and N.J.S.A. 25:2-25 under the applicable statute of limitations, N.J.S.A. 25:2-31, requiring only that "at least one claimant that did not become aware of any asbestos-related injury until one year prior to the date on which G-I Holdings filed for bankruptcy."  313 B.R. at 640, 648.

[16] N.J.S.A. 25:2-31 provides:

A cause of action with respect to a fraudulent transfer or obligation under this article is extinguished unless action is brought:

a. Under subsection a. of R.S. 25:2-25, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was discovered by the claimant;

b. Under subsection b. of R.S. 25:2-25 or subsection a. of R.S.2 5:2-27, within four years after the transfer was made or the obligation was incurred; or

c. Under subsection b. of R.S. 25:2-27, within one year after the transfer was made or the obligation was incurred.

[17] This was not argued to the Bankruptcy Court, but the Court's decision in refusing to apply equitable tolling is correct as a matter of law and can therefore be affirmed by this Court.  See <u>Thrifty Oil Co. Bank of Am. Nat'l Trust & Sav. Ass'n</u>, 322 F.3d 1039, 1046 (9th Cir. 2002).

276 B.R. 394, 398 (Bankr. E.D. Pa. 2002).  On the other hand, under a statute of repose the legislature has made a policy decision that after a determined period of time a potential defendant has a right to be protected from liability and that right is a substantive one.  Id.  As a result, because a statute of repose sets an absolute time bar for commencing an action, it is not subject to equitable tolling.  Lampf, Kpleva, Lipkind, Prupis & Petigrow v. Gilbertson, 501 U.S. 350, 363 (1991); In re Sharps Run Associates, L.P., 157 B.R. 766, 783 (D.N.J. 1993); In re Commercial Financial Services, 294 B.R. 164, 173 (Bankr. N.D. Okla. 2003).

The limitations period under the Uniform Fraudulent Conveyance Act is recognized by many jurisdictions as a statute of repose.  See Epperson v. Entertainment Express, Inc., 338 F. Supp. 2d 328, 343-44 (D. Conn. 2004); United States v. McLendon, 1999 U.S. Dist. LEXIS 12796, *12 (N.D. Tex. 1999); First Southwestern Fin. Servs. v. Pulliam, 121 N.M. 436, 438 (N.M. Ct. App. 1996).  New Jersey is among those jurisdictions.  Courts that have specifically addressed N.J.S.A. 25:2-31 have universally concluded that it is a statute of repose and therefore not subject to equitable tolling.  See Intili v. Di Giorgio, 300 N.J. Super. 652, 693 A.2d 573 (Ch. Div. 1997) (cited with approval by the New Jersey Supreme Court in Sasco v. Zudkewich, 166 N.J. 579, 767 A.2d 469 (2001)); In re Princeton-

New York Investors, Inc., 199 B.R. 285, 293 n.4 (Bankr. D.N.J. 1996); In re Buildings By Jamie, Inc., 230 B.R. 36, 45 (Bankr. D.N.J. 1998); Official Committee of Asbestos Claimants of G-I Holdings, Inc. v. Heyman, 277 B.R. 20, 30 (S.D.N.Y. 2002).

It is true that the Supreme Court of New Jersey in Sasco did *refer* to N.J.S.A. 25:2-31 as a statute of limitations, but it did not *decide* that it was a statute of limitations[18] as distinguished from a statute of repose.  That was not the issue before the Court.  Rather the Court addressed only the issue of the correct statutory interpretation of when within one year of the transfer a claimant reasonably should have discovered the transfer.  Sasco v. Zudkewich, 166 N.J. 579 (2001).[19]

Because equitable tolling is inapplicable to N.J.S.A. 25:2-31, it is of no consequence that the Bankruptcy Court erred by failing to accept all of the Committee's allegations as true.  Nor is it of any consequence that in assessing the applicability of the Georgine Injunction the Committee should not have been required to identify a plaintiff who would be able to take advantage of equitable tolling.  Likewise it is not necessary to

---

[18] It is hardly surprising that the Supreme Court in Sasco referred to the statute of limitations when the legislature used the same terminology but clearly meaning it was a statute of repose: "Finally, the bill also provides a statute of limitations that bars the right rather than the remedy on the expiration of the statutory periods prescribed."  1988 N.J. Laws 74, 1988 N.J. Sess. Law Serv. 74 (West) (emphasis added).

[19] The statute has since been amended.  See supra note 13.

remand for an evidentiary hearing to develop a record as to
whether the <u>Georgine</u> Injunction did or did not bar asbestos
victims from asserting claims against BMCA.

### Conclusion as to Point One

The Bankruptcy Court did not err by holding that the
doctrine of equitable tolling did not toll the statute of
limitations embodied in N.J.S.A. 25:2-31, barring the Committee
from pursuing its constructive fraud claims as to the Pushdown
Transaction.

> B.   <u>Whether the Bankruptcy Court Erred in Denying the
> Committee's Request to File an Adversary Proceeding on
> Behalf of G-I Holdings, Challenging the Securitization
> Transaction</u>

The Committee sought to institute an adversary proceeding
against BNY and the Noteholders challenging the Securitization
and subsequent payments as initial, mediate, or immediate
transferees of the encumbrances as voidable and recoverable
transfers under 11 U.S.C. §§ 544(b), 547(b), 548(a), 549(a), and
550(a).[20]  The Bankruptcy Court denied the request, concluding
that the Committee had failed to present a colorable claim.  313
B.R. at 653.

On appeal the Committee argues that the Bankruptcy Court
erred on two accounts in concluding that the Securitization

---

[20] The Committee also advanced an independent theory challenging the
Securitization Transaction: the corporate veil separating these commonly
controlled corporations should be pierced.  313 B.R. at 653.

claims were not colorable: (1) since the adversary claims were premised on the contingent event of a judicial determination of alter ego status or substantive consolidation, they were not ripe and the court therefore lacked subject matter jurisdiction, id. at 652; and (2) as to the independent claims, the Committee was already prosecuting avoidance claims based on alter ego and veil piercing allegations in the substantive consolidation action in the Bankruptcy Court and in the successor liability action in the District Court and shouldn't be permitted to litigate these issues in an adversary proceeding.  Id. at 653-54.

### 1.  Ripeness

The Bankruptcy Court determined that the Committee could not satisfy its burden of presenting a colorable claim to challenge the 2000 Securitization Transaction because there was a valid affirmative defense - lack of subject matter jurisdiction.  313 B.R. at 652.  In determining that the proposed claims were not ripe, the Bankruptcy Court relied on this Court's decision reported in In re G-I Holdings, 318 B.R. 66, aff'd, 122 Fed. Appx. 554, noting that the Committee's Securitization claims were similar to the Committee's request to modify the Preliminary Injunction and that this Court's "conclusion on the issue of ripeness is equally applicable and pertinent to the present motion . . . ."  313 B.R. at 651.

The application to modify the Preliminary Injunction arose

when BMCA in March of 2003 notified the Committee of its
intention to replace the existing credit arrangements with a new
facility with Citibank.  The Committee consented, but with the
request that such consent be subject to the condition that the
Committee, G-I Holdings or BMCA be precluded from asserting any
defense to any future action arising out of the use of the
proceeds of the refinancing to repay BNY or the Noteholders.  The
Bankruptcy Court refused this request on the ground that the
issue of BNY and the Noteholders' future defenses or rights were
not ripe for judicial review and therefore it lacked subject
matter jurisdiction pursuant to 28 U.S.C. § 1334(b).[21]

The Committee argues that the Bankruptcy Court erred because
the Bankruptcy Court drew unwarranted parallels between the
relief sought then and the relief sought now.  The Committee
argues that in the former action the Committee was seeking merely
to preserve future claims while in this action it is seeking to
assert presently existing claims.  In the Committee's words,
"[i]nstead of determining whether the Committee's claims were
'colorable' under the appropriate Rule 12(b)(6) standard, the

---

[21] The Bankruptcy Court noted four contingent events had to occur
before any of BNY's purported defenses were viable: (1) the Committee must
prevail in the Successor Liability Action and establish that BMCA is liable
for G-I Holdings' asbestos liability; (2) BMCA must file for bankruptcy
relief; then (3) the "Committee must succeed in getting the resultant BMCA
estate substantively consolidated with the G-I Holdings estate and
finally,(4) the Committee must successfully make the substantive
consolidation retroactive to the January 5, 2001 Petition Date."  318 B.R.
at 75.

Bankruptcy Court set forth an entirely new test, found neither in statute or case law, which would require the [C]ommittee to prove its alter ego allegations before even being allowed to file a complaint to assert the Securitization Claims." (Memorandum of Law in Support of Committee's Appeal at 20.)

The Committee is correct. The two cases appear to be similar but in fact are not. As the Third Circuit noted, BNY's possible acquisition of new defenses due to refinancing did not create a substantial controversy of sufficient immediacy and reality to satisfy ripeness concerns. The chain of hypotheticals presented a controversy too remote for judicial review.

In the first case, the Committee was seeking an immediate adjudication of the merits of defenses that BNY may acquire as result of the refinancing. In the case at hand, the Committee is not requesting a premature adjudication of the merits but rather permission to bring an adversary proceeding on a contingent claim. But because a claim is contingent does not mean it that it cannot be alleged. See Fed. R. Civ. P. 8(e)(2) (permitting alternative or hypothetical claims); Langer v. Monarch Life Ins. Co., 966 F.2d 786, 802 n.21 (3d Cir. 1992); Deeerhurst Estates v. Meadow, 70 N.J. Super. 404, 409 (App. Div. 1961) (under UFCA complaint to set aside transfer may be filed before adjudication of underlying claim). The ripeness doctrine does not prohibit the pleading of contingent claims. See In re Tyco Int'l Ltd.

26

Multidistrict Litigation (MDL 1335), No. 03-1343-B, 2004 U.S.
Dist. LEXIS 4131 (D.N.H. March 16, 2004) (Tyco's contribution
claim against Kozlowski ripe despite contingent on ERISA and
securities litigation pending against TYCO) (citing D'Onofrio
Constr. Co. v. Recon Co., 255 F.2d 904 (1st Cir. 1958)).

        At this stage of the proceedings the Committee is not
required to present its proof.  The colorable claim element of
the derivative standing test only requires the Court to decide
whether the Committee has asserted "claims for relief that on
appropriate proof would support a recovery . . . ."  In re STN
Enterprises, 779 F.2d 901, 905 (2d Cir. 1985).  Absent the
defense of ripeness, the Bankruptcy Court recognized that the
Committee did not fail to state a legally cognizable claim.  In
addressing G-I Holdings' failure to initiate an avoidance action,
the Bankruptcy Court noted "the fact that the Pushdown and
Securitization transactions were implemented by executives who
still remain in charge of both G-I Holdings and BMCA."  313 B.R.
at 630.  The Bankruptcy Court also observed "[m]ore particularly,
the individual that principally drafted the reorganization
agreement for the Pushdown transaction, Richard Weinberg, is not
only the President of G-I Holdings, but also serves as Executive
Vice-President and General Counsel for BMCA."  Id.  And in
response to the Committee's argument that it had independent
standing to challenge the Securitization Transaction under a

theory of "reverse corporate veil piercing" under <u>Securities</u>

<u>Investor Protection Corp v. Stratton Oakmont, Inc.</u>, 234 B.R. 293

(Bankr. S.D.N.Y. 1999), the Bankruptcy Court observed:

> [T]he requirements for pleading a reverse
> veil piercing claim may not be as onerous
> as both BMCA and G-I Holdings suggest.
> Based on the factual record before the
> Court, the Committee may be able to bear
> its burden of pleading the requisite degree
> of control between BMCA and G-I Holdings.

<u>Id.</u> at 656.

Because the Committee is seeking to assert a claim, albeit a

contingent one, and not seeking to preclude a possible future

defense, this Court's prior decision is not, as BNY asserts, the

law of the case.  Under the appropriate Rule 12(b) standard, the

Committee could have been allowed to file a complaint to

challenge the Securitization Transaction under alter ego

theories.

### 2.  Alter Ego and Veil Piercing Allegations

Because the Securitization Claims are ripe doesn't mean,

however, that the Bankruptcy Court was required to determine that

the claims were colorable so as to provide derivative standing.

The Bankruptcy Court was well within its rights in holding that

because the Committee was already pursuing alter ego and veil

piercing allegations in the Successor Liability Action pending in

this Court and the Substantive Consolidation Action, pending in

the Bankruptcy Court, it should not be permitted to prosecute

avoidance claims that re-allege alter ego and veil piercing

allegations in another adversary proceedings.[22]  <u>Id.</u> at 653-654.
A discussion of the Rule 12(b)(6) standard doesn't end the
analysis of what constitutes a colorable claim.  The colorable
claim must not only benefit the estate if successful, but it
must, as the Bankruptcy Court acknowledged, be based on a cost-
benefit analysis.  <u>Id.</u> at 629.

    This Court and the Magistrate Judge have been working to
ready the Successor Liability Action for trial.  There remain
many and difficult issues for the Bankruptcy Court to yet decide.
No one has explained why, just months away from trial, the estate
would benefit from yet another adversary proceeding that
essentially duplicates existing litigation.  Sound judicial
administration justifies the Bankruptcy Court's denial of the
Committee's request to bring the proposed avoidance action.

**Conclusion as to Point Two**

    The Bankruptcy Court did not err by denying the Committee's
request to file an adversary proceeding on behalf of G-I Holdings
challenging the Securitization Transaction.

---

    [22] The Bankruptcy Court's "docket management" analysis focused on the
independent theory.  The Committee argues that the alter ego doctrine
serves different purposes: in successor liability it supports damages
against BMCA for G-I Holdings' asbestos torts, while in its Securitization
Claims it supports the claim that encumbered assets of BMCA are part of G-
I's estate.  (<u>See</u> Committee's Reply and Answering Brief at 19 n.9.)  That
may be true, but while the facts to be litigated are the same, the purpose
might be different.

**IV. DISCUSSION OF CROSS-APPEAL OF G-I HOLDINGS, BMCA AND BNY**[23]

    A.   <u>Whether the Bankruptcy Court Erred in Not Performing a Cost-Benefit Analysis as a Prerequisite to Granting Leave to the Committee to Sue to Avoid the January 1994 Transaction under Section 544(b) of the Bankruptcy Code</u>

G-I Holdings[24] and BMCA appeal that part of the decision giving the Committee leave to sue BMCA derivatively on behalf of G-I Holdings for the purpose of avoiding as a fraudulent transfer the January 1994 transfer of G-I Holdings' business assets. No one disputes that in the absence of a Third Circuit test the appropriate test to be applied is the one articulated in <u>In re STN Enterprises</u>, 779 F.2d 901 (2d Cir. 1985) [hereinafter <u>STN</u>]. The Bankruptcy Court itself acknowledged <u>STN</u> as the test to be applied. The basis of this appeal is that the Bankruptcy Court failed to properly apply the <u>STN</u> test.

In <u>STN</u>, the Second Circuit Court of Appeals set forth a two-part test for derivative standing: (1) the court must determine whether a claimant has presented a colorable claim; (2) the court must then undertake a cost-benefit analysis. The second stage, this cost-benefit analysis, requires the court to weigh the potential harm to the estate against the ability of the party

---

[23] <u>See supra</u> note 12.

[24] Although G-I Holdings argues that it was operating under a disabling conflict of interest, (Answering and Opening Brief of Appellees/Cross-Appellants at 39-40), under a clearly erroneous standard as to facts, <u>In re Fegeley</u>, 118 F.3d 979, 982 (3d Cir. 1997), or under a plenary review as to legal conclusions, <u>id.</u>, this Court can discern no basis to disturb the Bankruptcy Court's decision on this issue.

seeking derivative standing to succeed with its claim.  This

second step requires the court to evaluate the following factors:

    1.   Whether the action is likely to benefit the
         reorganization estate;
    2.   The probabilities of legal success in the event the
         action is pursued;
    3.   Financial recovery in the event of success;
    4.   Whether appointment of a trustee or another party to
         bring the action would be preferable; and
    5.   The cost to the estate in proceeding with the action
         and the terms relative to any attorneys fees.

STN, 779 F.2d at 905-906.

    There is no question that the Bankruptcy Court found a

colorable claim.  313 B.R. at 645. But it is equally clear that

the Bankruptcy Court did not make specific findings of fact to

support a cost-benefit analysis under STN.  This omission is

apparent from reading the opinion as well as from the Committee's

own argument.  In response to the absence of any findings, the

Committee argues that "[i]nherent in the Bankruptcy Court's

decision to grant the Committee authority to pursue the Pushdown

Claims is a finding that G-I's allegations of potential harm to

BMCA were insufficient to outweigh the possible loss of the value

of avoidance actions to the G-I estate."  (Reply and Answering

Brief for the Committee at 33 n.14) (emphasis added.)  The

absence of findings is highlighted when the Committee argues that

"G-I's allegations of possible harm were extensively litigated in

the Bankruptcy Court and were the subject of lengthy briefing and

colloquy during the hearing on the Authorization Motion

(citations omitted) and that the Bankruptcy's decision

31

"<u>implicitly</u> rejected appellees' arguments." (<u>Id.</u>) (emphasis added.)

A cost-benefit analysis may very well have been done by the Bankruptcy Court, but it was not done explicitly.  A decision as important as this cannot properly be supported by inference.  The <u>STN</u> cost-benefit analysis requires detailed factual findings. <u>See</u> <u>Louisiana World Exposition v. Federal Ins. Co.</u>, 864 F.2d 1147, 1153 (5th Cir. 1989); <u>In re KDI Holdings, Inc.</u>, 277 B.R. 493, 506 (Bankr. S.D.N.Y. 1991); <u>In re Fas Mart Convenience Stores, Inc.</u>, 2003 WL 22048024 (E.D. Va. 2003).  Without findings there is no way for this Court to review whether the <u>STN</u> cost-benefit analysis was done or whether it was done properly.

The Committee is incorrect when it argues that having decided that a claim is colorable, using a Rule 12(b)(6) motion to dismiss standard, the Bankruptcy Court was "not permitted to consider affirmative defenses that would not appear on the face of the complaint, or defenses that could be established only after a review of the facts."  (Reply and Answering Brief for the Committee at 35.)  The Committee conflates the two stages under the <u>STN</u> analysis.  As the Second Circuit held

> If the Committee presents a colorable claim
> . . . the court must also examine on
> affidavit and other submission, <u>by</u>
> <u>evidentiary hearing or otherwise</u>, whether
> an action asserting such a claims) is
> likely to benefit the reorganization
> estate.

779 F.2d at 905 (emphasis added).

The Bankruptcy Court did not address G-I Holdings' position that the creation of BMCA and the subsequent transfer of assets from G-I to BMCA could not have harmed creditors because from 1994 to 2000 the undisputed evidence shows that BMCA's sales, revenue, profits and value increased substantially.  Nor is there any response to the Committee's argument that the Committee can't prevail as mediate or immediate transferees because the $700 million loan of the Noteholders to BMCA occurred after the creation of BMCA.  While the Bankruptcy Court recognized the argument of G-I Holdings and BMCA that the filing of the proposed avoidance action would "materially harm" BMCA's business, 313 B.R. at 630, the Bankruptcy Court did not evaluate the argument.

Under STN, the Bankruptcy Court should have independently weighed and considered what harm BMCA would incur by having to respond to the Committee's avoidance action.  This is particularly true in light of the testimony of BMCA's Chief Executive Officer, Mr. Collins, at the substantive consolidation hearing, (see R. 13, E 3 at p. 32-37, E 4 at p. 26:15-28:3), that putting BMCA into bankruptcy would have a substantial negative impact on BMCA.  Granted, Collins' testimony was directed to the harm to BMCA if forced into bankruptcy rather than any harm if the Committee is authorized to proceed with its avoidance action, but, at the very least, the Bankruptcy Court should have considered the relevance of Collins' testimony.

The Committee's reliance on <u>Official Comm. of Unsecured Creditors of Cybergenitics Corp. v. Chinery</u>, 330 F.3d 548, 574-75 (3d Cir. 2003), for the proposition that the Bankruptcy Court need not consider evidence of harm is misplaced.  In saying that "the possibility of an avoidance action might trouble a prospective supplier or lender," 330 F.3d at 575, the Third Circuit was simply making the point that that consideration wasn't enough to withhold from creditors' committees the right to bring an avoidance action.  The Court wasn't addressing the issues addressed by <u>STN</u>.

When performing a cost-benefit analysis, <u>STN</u> requires that the Bankruptcy Court consider the availability of other remedies.  This was not done.  Is this avoidance action really necessary in light of the request for retroactive substantive consolidation pending in the Bankruptcy Court and the action for successor liability and piercing the corporate veil pending in this Court?  At least the Bankruptcy Court should have considered this before authorizing the Committee to proceed.

<u>STN</u> also requires that "fee arrangements should not only be made a matter of record but should be carefully examined by the court as it makes that determination."  779 F.2d at 905; <u>see also In re KDI Holdings, Inc.</u>, 277 B.R. 493, 519 (Bankr. S.D.N.Y. 1999); <u>In re Housecraft Indus. USA, Inc.</u>, 310 F.3d 64, 71 (2d Cir. 2003); <u>In re America's Hobby Center, Inc.</u>, 223 B.R. 275, 284

34

(Bankr. S.D.N.Y. 1998).  Since the litigation is being financed completely by G-I Holdings, some consideration on the record should have been given to this factor, particularly in light of the pending litigation this Court.

This Court is not persuaded by G-I Holdings' argument that the Bankruptcy Court's decision granting the Committee leave to file a complaint asserting the Pushdown Claims should be reversed because the Court did not require the Committee to identify a pre-petition unsecured creditor holding an allowable claim. Although the Committee did not file a proposed complaint in conjunction with its motion for leave to prosecute the Pushdown Claims, it did file a summary of claims to be asserted by the Committee.  313 B.R. at 640; (see R. 12, E 32.)  The motion was sufficiently detailed to provide the Bankruptcy Court with enough information to determine standing.  See In re Mir Kazem Kashani and Habibeh S. Kashani, 190 B.R. 875, 885 (9th Cir. BAP 1995); Louisiana World Exposition, 858 F.2d at 235 & 247 n.15. Moreover, the Bankruptcy Court instructed the Committee to "identify at least one claimant that did not become aware of any asbestos-related injury until one year prior to the date on which G-I Holdings filed for bankruptcy."  313 B.R. at 648.  When the Committee filed its complaint it did identify two asbestos victims whose rights to avoid the Pushdown Transaction the Committee alleges are timely under the discovery rule of N.J.S.A.

35

25:2-31(a).  Since the Committee has in fact alleged the existence of a proper creditor, if there were a foul, it is hard to see any harm requiring reversal on this point.

Because the Bankruptcy Court did not make factual findings with respect to the factors enumerated by the Second Circuit in STN, the Court vacates the order allowing the Committee to sue BMCA and remands the proceedings to the Bankruptcy Court to make a cost-benefit analysis as required by STN.  779 F.2d at 905-906. The Bankruptcy Court of course is free to make that determination as it sees fit; it is not required, as G-I Holdings keeps asserting, to hold an evidentiary hearing.  STN counsels that the examination of whether an action asserting such claim(s) is likely to benefit the reorganization estate can be done "on affidavit and other submission, by evidentiary hearing or otherwise."  Id.

> B.    Whether the Bankruptcy Court Erred in Authorizing the
>       Committee to Institute Proceedings Against the Bank of
>       New York under Section 500(a) to "Recover" the December
>       2000 Liens

Both G-I Holdings and BNY contend that the Bankruptcy Court improperly granted the Committee leave to sue BNY to "recover" under section 550(a)(1) of the Bankruptcy Code the liens that had been granted BNY by BMCA in December 2000 to secure existing and new credit on the theory that such liens were interests in property that were the subject of the alleged fraudulent transfer in January 1994 by G-I Holdings of the building materials

36

business to its wholly owned indirect subsidiary, BMCA.  The error was made, it is argued, because the Bankruptcy Court did not evaluate whether this claim was colorable or make any cost-benefit analysis as required by STN.

Had the Bankruptcy Court performed a proper cost-benefit analysis it would have concluded, BNY argues, that the Committee's proposed claim to avoid the 1994 Pushdown Transaction would have little likelihood of success and the cost of litigation would exceed any benefit to the G-I estate.  The 1994 transaction, so the argument goes, did not injure the asbestos plaintiffs because G-I Holdings transferred its building materials business assets to BMCA for 100% of the equity interest in BMCA, which G-I Holdings still owns.

BNY also argues the Bankruptcy Court erred by not evaluating whether the section 550(a) recovery claim was colorable or survived a cost-benefit analysis.  BNY argues that the Bankruptcy Court did not even address BNY's mootness and lack of subject jurisdictional matter defenses and had the Bankruptcy Court done so, it should have analyzed them under a Rule 12(b)(1) standard. See Hedges v. United States, 404 F.3d 744, 750 (3d Cir. 2005) (jurisdictional challenge under Rule 12(b)(1) precludes a district court from presuming truthfulness of plaintiff's allegations, requiring court's evaluation of merits of jurisdictional claims).  BNY argues that even if the Committee

37

could obtain a judgment avoiding the January 1994 transfer from G-I Holdings to BMCA as fraudulent, there is nothing to recover from BNY because the assets remained with BMCA and the only thing transferred were the security interests (liens) to secure the BNY Credit Facility and the BMCA notes.  And when the notes were paid when due (as specifically authorized by the Bankruptcy Court), the liens were extinguished; therefore, there is, BNY contends, nothing to recover because the liens no longer exist and have no value.

If the Bankruptcy Court had evaluated the colorability of the claim and performed the requisite cost-benefit analysis, it would also, BNY argues, have realized that recovery under section 550(a) is precluded by section 550(b), which provides that a trustee cannot recover from "a transferee that takes for value, including satisfaction or securing of a present or antecedent debt, in good faith and without knowledge of the voidability of the transfer avoided."  11 U.S.C. § 550(b)(1).  BNY contends that section 550(b)(1) was satisfied because BNY Lenders and the Noteholders gave value in connection with the December 2000 Transaction; BNY and the Noteholders acted in good faith in taking the security interests in BMCA's assets; BNY acted without "knowledge of the voidability" of the 1994 Transaction.

BNY further argues that in addition to not considering the application of section 550(b), the Bankruptcy Court also erred in

38

not considering BNY's defense under section 500(d), which
provides that "The trustee is entitled to only a single
satisfaction under subsection (a) of this section."  11 U.S.C. §
550(d).  In other words, the payments received by BNY and the
Noteholders from BMCA were repayments of credit previously
advanced by them to BMCA after the 1994 Transaction and therefore
any claim for repayments has already been satisfied within the
meaning of section 550(d).  See In re Cybridge Corp., 312 B.R.
262 (Bankr. D.N.J. 2004) (trustee precluded from recovery of
avoidable transfers because lender had returned all cash it
received from debtor in form of new loans); In re Bassett, 221
B.R. 49 (Bankr. D. Conn. 1998) (no recovery where subsequent
transferee had refinanced lien, paying off original obligation
under lien); In re Jeffrey Bigelow Design Group, Inc. 956 F.2d
479 (4th Cir. 1992).

     The Bankruptcy Court's opinion also does not indicate
whether or not it makes any sense, in terms of expense and delay,
to pursue the section 550(a) claims until resolution of the
avoidance claims, particularly since BNY is a party in the
successor liability and piercing the corporate veil action in the
District Court.  Resolution of that action should result in a
resolution of a lot of issues plaguing the Bankruptcy Court.

     Before the Bankruptcy Court could grant the Committee
derivative standing to pursue section 550(a) claims to recover

the December 2000 liens, it was required under <u>STN</u> to evaluate
the colorability of the claims in light of §§ 550(b)(1) and
550(d) and to perform a cost-benefit analysis that considered and
weighed the likelihood of success and the amount that could
reasonably be expected to be recovered against the anticipated
delay and expenses to the estate of prosecuting the proposed
action.  That evaluation ought, in the first place, be done in
the bankruptcy forum.  The Court will therefore reverse that part
of the Order granting the Committee leave to assert derivative
claims to recover from BNY the liens received by BNY in the 2000
Transaction and will remand the matter to the Bankruptcy Court to
make the required findings of fact as to the <u>STN</u> factors.

**V. CONCLUSION**

The Court denies the Committee's appeal from that portion of
the opinion of the Bankruptcy Court denying the Committee (1)
leave to plead the inapplicability of the statute of limitations
pertaining to the Pushdown Claims and (2) leave to plead the
Securitization Claims.

The Court, however, can find no basis to reverse the
Bankruptcy Court's decision permitting the Committee to challenge
for either constructive or actual fraud regarding the Pushdown
Transaction because the ten-year statute of limitations available
to the New Jersey Department of Environmental Protection,
N.J.S.A. 2A:14-1.2, operates in favor of the Committee.  313 B.R.

at 635-36.

The Court also can find no basis to reverse the Bankruptcy Court's determination that the discovery rule in the New Jersey Uniform Fraudulent Transfer Act operates in favor of asbestos claimants whose disease did not become manifest until one year before G-I Holdings filed its bankruptcy petition.  313 B.R. at 636-43.

With regard to the cross-appeal of G-I Holdings, BMCA and BNY, the Bankruptcy Court erred by omitting certain critical factual determinations; therefore, the Court: (1) grants the appeal of G-I Holdings and BNY, (2) vacates that portion of the order granting the Committee leave to assert against BMCA, BNY and the Noteholders on behalf of G-I Holdings' Estate claims to avoid the transfers in the January 1994 Transaction and to recover from BNY the liens received by BNY in the December 2000 Transaction, and (3) remands to the Bankruptcy Court for further proceedings consistent with this Opinion.

An appropriate Order follows.

Dated: June 21, 2006

 /s/ William G. Bassler
William G. Bassler, U.S.S.D.J.
